United States Court of Appeals
Fifth Circuit

**F I L E D**

**June 18, 2007**

Charles R. Fulbruge III
Clerk

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 06-10724

_____

DARREL RUNDUS; GREAT NEWS NETWORK, INC.,

                                        Plaintiffs-Appellants

    v.

MICHAEL CHERTOFF, SECRETARY, DEPARTMENT OF
HOMELAND SECURITY; MARK L. LOWERY, Individually
and in his official capacity as Special
Agent-in-Charge for the United States Secret
Service, Department of Homeland Security, United
States of America; ROY WHATLEY, JR., Individually
and in his official capacity as Special Agent for
the United States Secret Service, Department of
Homeland Security, United States of America,

                                        Defendants-Appellees

_____
Appeal from the United States District Court
for the Northern District of Texas
(3:06-CV-1032)
_____

Before HIGGINBOTHAM, WIENER, and PRADO, Circuit Judges.

WIENER, Circuit Judge[*]:

    Three United States Secret Service agents confiscated 8,300

religious hand-outs from Plaintiffs-Appellants Great News

Network, Inc. ("GNN") and Darrel Rundus (collectively, "the

Plaintiffs"). These hand-outs resembled Federal Reserve notes

(dollar bills), but were each in the denomination of $1 million,

_____

    [*] Pursuant to 5TH CIR. R. 47.5, the court has determined that
this opinion should not be published and is not precedent except
under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

a denomination never issued by the United States Department of the Treasury. The Plaintiffs filed a civil rights lawsuit against Defendants-Appellees Michael Chertoff, Mark L. Lowery, and Roy Whatley, Jr. (collectively, "the government"), claiming that their actions violated the Plaintiffs' constitutional rights.

On the same day that they filed their complaint, the Plaintiffs sought a preliminary injunction from the district court that would permit the continued use of the hand-outs. The district court denied the Plaintiffs' preliminary injunction, concluding that they had failed to establish a substantial likelihood of success on the merits. The Plaintiffs now appeal that denial to us. Satisfied that the district court did not abuse its discretion, we affirm.

## I.  FACTS AND PROCEEDINGS

GNN is an evangelical training ministry with approximately 1,000 members in ten countries. Its headquarters are in Denton, Texas, and Rundus is its president.

As part of its ministry, GNN distributes the subject hand-outs, which are designed to look like Federal Reserve notes with a face value of $1 million. The Plaintiffs admit to having distributed over one million of the hand-outs in the three years preceding this lawsuit.

2

The Plaintiffs do not produce or create these hand-outs. Rather, the Plaintiffs obtain them from Living Waters Publications, Inc. ("Living Waters"), which operates out of Bellflower, California.[1] In his affidavit of June 15, 2006, the president of Living Waters averred that, in the previous four years, Living Waters had distributed over 5.3 million of the hand-outs world-wide, 95 percent of which were distributed in the United States.

The hand-outs are in the general style of the Treasury Department's Series 2004 notes. Each bears a portrait of former President Grover Cleveland on its face and a vignette of the United States Supreme Court building on its reverse side.[2] In addition, the hand-outs are of the same dimensions as the Series 2004 note designs, and have nearly identical color schemes and layouts.

---

[1] Such hand-outs are still being offered for sale by Living Waters.

[2] The Series 2004 currency designs are the same size as and have the same portraits, vignettes, and images as previous currency designs, but also have additional security and design features that their predecessors lacked, such as (1) color-shifting ink, (2) watermarks, (3) security threads, (4) symbols of freedom, (5) additional subtle coloration, (5) updated portraits and vignettes, (6) microprint text, (7) low vision features, (8) Federal Reserve indicators, and (9) different serial numbering. The $20 denomination was first issued on October 9, 2003; the $50 denomination was issued on September 28, 2004; the $10 denomination was issued on March 2, 2006.

There are, however, myriad intentional differences that distinguish the hand-outs from actual legal tender. First, the paper on which the hand-outs are printed is palpably different from that used for Federal Reserve notes: The paper on which the hand-outs are printed is substantially thicker and more rigid than that of real currency, the hand-out's stock having a consistency similar to that of smooth construction paper.

Second, there are numerous verbal indicators on the hand-outs that distinguish them from real currency. These include (1) on the left side of each hand-out's face, the faux Federal Reserve indicator reads "Reserved Federal System," contrast to that of the official indicator, "Federal Reserve System;" (2) the lower left corner of each face contains the statement "This note is not legal tender for all debts, public and private;" (3) also in the lower left corner, each is purportedly signed by a representative of the "Department of Eternal Affairs;" (4) on the lower right side of the face of each is a notation of the website "www.WayOfTheMasterRadio.com;" (5) on the top border of the face of each is written "Reserved Note," instead of "Federal Reserve Note;" (6) the ostensible seal of the United States Department of Treasury on the right side of the face of each states "Thou Shall Not Steal —— Isaiah Fifty Five One;" and (7) the border of the reverse side of each reads:

The million-dollar question: Will you go to Heaven? Here's a quick test. Have you ever told a lie, stolen anything, or used God's name in vain? Jesus said, "Whoever looks at a woman to lust for her has already committed adultery with her in his heart." Have you looked with lust? Will you be guilty on Judgment Day? If you have done those things, God sees you as a lying, thieving, blasphemous, adulterer-at-heart. The Bible warns that if you are guilty you will end up in Hell. That's not God's will. He sent His Son to suffer and die on the cross for you. Jesus took your punishment upon Himself. "God so loved the world that he gave his only begotten Son, that whoever believes in Him should not perish but have everlasting life." Then He rose from the dead and defeated death. Please, repent (turn from sin) today and trust in Jesus, and God will grant you everlasting life. Then read your Bible daily and obey it. www.livingwaters.com

Early in June 2006, after an individual in North Carolina attempted to deposit one of the hand-outs into his personal bank account, three United States Secret Service agents traced that hand-out back to the Plaintiffs, went to GNN's headquarters, and seized eighty-three packs of hand-outs, each of which contained 100 individual hand-outs. In addition, the agents informed the Plaintiffs that the government intended to issue a cease-and-desist order requiring them to discontinue their use of the hand-outs.

Ten days after the seizure, the Plaintiffs filed a civil lawsuit in the district court, alleging that the seizure and threatened cease-and-desist order violated their First and Fourth Amendment rights and seeking a declaratory judgment that

5

distribution of the hand-outs was protected First Amendment expressive activity. In addition, the Plaintiffs sought a permanent injunction (1) prohibiting the government from seizing additional hand-outs and (2) requiring the government to return those that it had seized. As an alternative measure of relief, the Plaintiffs sought monetary damages in the event that the government had already destroyed the hand-outs or otherwise made their return impossible.

On the same day that they filed their complaint, the Plaintiffs filed a motion for a preliminary injunction to restrain the government from issuing a cease-and-desist order that would prohibit the Plaintiffs from thereafter acquiring, distributing, or using such hand-outs. The Plaintiffs argued that the government lacked statutory authority either to seize the hand-outs or to prohibit their future use.

The district court denied the Plaintiffs' motion, determining that they had failed to establish a substantial likelihood of success on the merits. The Plaintiffs timely filed a notice of appeal.

## II. LAW AND ANALYSIS

A. <u>Standard of Review</u>

Our jurisdiction to review a district court's order denying injunctive relief is premised on 28 U.S.C. § 1292(a)(1). We

ultimately review denials of preliminary injunctions for abuse of discretion, but we review <u>de novo</u> decisions based on erroneous principles of law.[3]

To prevail on a motion for preliminary injunction, a plaintiff must show (1) a substantial likelihood of success on the merits, (2) a substantial threat that he will suffer irreparable injury if the preliminary injunction is denied, (3) his threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted, and (4) granting the preliminary injunction will not disserve the public interest.[4]

B.  <u>Merits</u>

Overarching this case is its context: This is not a criminal counterfeit case, but a civil case involving the exercise of administrative discretion.  On appeal, the Plaintiffs contend that the government's asserted statutory authority for its seizure and cease-and-desist order — 18 U.S.C. §§ 474, 475 — does not apply to fake Federal Reserve notes of fictitious or non-existent denominations, such as $1 million, and thus the government's actions were improper.  As an alternative, the

---

[3] <u>Lake Charles Diesel, Inc. v. Gen. Motors Corp.</u>, 328 F.3d 192, 195 (5th Cir. 2003).

[4] <u>Speaks v. Kruse</u>, 445 F.3d 396, 399-400 (5th Cir. 2006).

7

Plaintiffs assert that, to the extent that §§ 474 and 475 do apply to non-existent denominations, the government still exceeded its authority, because the hand-outs are not a sufficient "similitude" or "likeness" of a Federal Reserve note to fall within the ambit of §§ 474 and 475.

1.   Fictitious Obligations

Here, the relevant portions of § 474 — paragraphs six and seven — make it a felony (1) to possess with the intent to sell "any obligation or other security made or executed, in whole or in part, after the similitude of any obligation or other security issued under the authority of the United States," or (2) to "print[], photograph[], or in any other manner make[] or execute[] any engraving, photograph, print, or impression in the likeness of any such obligation or other security."  Section 475 prohibits the making, distribution, or use[5] of any business or professional card, advertisement, or other similar documents[6] "in the likeness or similitude of any obligation or security of the United States."

In support of their position, the Plaintiffs advance two separate but related arguments.  They first contend that, as 18

_____

[5]  Section 475 also criminalizes designing, engraving, printing, execution, uttering, issuing, and circulation.

[6]  These other similar documents include notices, placards, circulars, and handbills.

8

U.S.C. § 8 defines "obligation or other security" as "Federal Reserve notes . . . of whatever denomination, <u>issued under any Act of Congress</u>," the hand-outs are not covered by §§ 474 or 475, because Congress has never authorized the printing, circulation, or issuance of a $1 million Federal Reserve note.[7]  We disagree.

Sections 474 and 475 require that the hand-outs be in the likeness or similitude of any Federal Reserve note issued by Act of Congress.  There is nothing in the statutory language, legislative history, or caselaw addressing these statutes that supports the conclusion that the use of a fictitious denomination alone is sufficient to render an instrument a <u>per se</u> non-likeness or non-similitude.  Rather, we are convinced that this is at most one factor to be considered in making the requisite determination.

Second, the Plaintiffs assert that the plain language and legislative history of 18 U.S.C. § 514 demonstrate that neither §§ 474 nor 475 cover Federal Reserve notes of fictitious denomination.  Section 514 prohibits the printing, passing, possessing, or movement in interstate commerce of "any false or fictitious instrument, document, or other item appearing, representing, purporting, or contriving through scheme or

---

[7] Emphasis added.

artifice, to be an actual security or other financial instrument issued under the authority of the United States," with the intent to defraud.

The Plaintiffs contend that, as § 514 covers "false or fictitious" representations of Federal Reserve notes, §§ 474 and 475 cannot also cover fictitious denominations without creating an overlap in criminal liability. The Plaintiffs would draw a distinction between "counterfeit" instruments, which are punishable under §§ 474 and 475, and "fictitious" instruments, which are punishable only under § 514.

In aid of their proposed interpretation, the Plaintiffs proffer then-Senator Alfonse M. D'Amato's introductory remarks to the Financial Instruments Anti-Fraud Act of 1995, which eventually led to the enactment of § 514.[8] Senator D'Amato expressed his belief that a loophole existed under federal <u>criminal</u> counterfeiting law that prevented counterfeiting <u>prosecutions</u> involving fictitious instruments that were not counterfeits of any existing negotiable instrument. Section 514, according to Senator D'Amato, would close this loophole.

Having considered this argument, we do not find the Plaintiffs' contention persuasive. The fact that two criminal

---

[8] 141 Cong. Rec. S9533-34, <u>quoted in</u> <u>United States v. Howick</u>, 263 F.3d 1056, 1066-67 (9th Cir. 2001).

10

statutes may penalize similar conduct does not require a mandatory application of one to the exclusion of the other.[9] Moreover, there is nothing in Senator D'Amato's remarks that leads us to believe that Congress intended § 514 to preempt §§ 474's and 475's application to false Federal Reserve notes of fictitious denomination.

2.   Similitude or Likeness Test

As their second argument on appeal, the Plaintiffs assert that the hand-outs do not so closely resemble actual Federal Reserve notes that they may be deemed to be a "similitude" or "likeness" within the intendment of these statutes.  This is a question of fact reserved to the fact-finder.[10]  Given the similarities (and despite the differences) between the hand-outs and actual Federal Reserve notes, we cannot say that the district court either clearly erred in finding similitude or abused its discretion in ruling that the Plaintiffs failed to satisfy their burden of establishing a substantial likelihood of success on the merits.

### III.  CONCLUSION

---

[9] Pasquantino v. United States, 544 U.S. 349, 358 n.4 (2005) ("The Federal Criminal Code is replete with provisions that criminalize overlapping conduct.  The mere fact that two federal criminal statutes criminalize similar conduct says little about the scope of either." (citations omitted)).

[10] Webb v. United States, 216 F.2d 151, 152-53 (6th Cir. 1954).

11

In closing, we re-emphasize the vast difference between the government's acts complained of here in merely confiscating the hand-outs because of their similarities to legal tender, on the one hand, and a criminal prosecution for counterfeiting (which this is not), on the other hand.  Within this non-criminal framework and based on the applicable law and our extensive review of the parties' briefs and the record on appeal, we hold that the district court did not abuse its discretion in denying the injunction sought by the Plaintiffs, ruling that the Plaintiffs failed to establish a substantial likelihood of success on the merits and thus failed to prove their entitlement to a preliminary injunction.

AFFIRMED.